Okay, that matter having been disposed of, are we connected on the telephone line in Zurich? Council? Yes, this is Armin Talit, Council for Appellate Zoo Stage. Your Honor, I'm connected. And this is Leo Spellese, Council for Zurich Life Insurance Company of America. All right, thank you. Let me make a preliminary statement to all counsel who are present here as well as by telephone, that our clocks reflect the total amount of time that you have. And that's a total time for rebuttal as well as for opening argument. And they do not take any visible account of time you wish to save for rebuttal. So if you don't want to be disappointed, just keep an eye on the clock and stop talking in your opening argument with some time left on the clock. Otherwise, you will not get any time. So we will now hear argument in Zurich. Mr. Spellese? Thank you, Your Honor. Counsel, this matter comes to the court based upon the granting of a motion for summary judgment on behalf of Zurich. It arises out of a key man policy that was issued to Zoo Stage and Arizona Corporation on the life of a one-blood Mercado. Mr. Mercado and Robert Rumsey had been associates, friends, business partners, in mining operations in Mexico for some 20 years prior to the venture that they formed Zoo Stage as a companion Mexican corporation called Oro Rico. The operation itself required that Mr. Mercado essentially undertake the activities in Mexico to hire workers, build roads to the mining sites which he owned interest in as well as Oro Rico did. He was a Mexican citizen. He was fluent in Spanish. Mr. Rumsey was 80 years old, not fluent in Spanish, but very keen on attempting to find and make a killing, hopefully, on gold mining activity. Mr. Spellese, may I ask you, this is Judge Reimer, may I ask you a kind of cutting to the chase question. You know, if this were just a matter of Ramsey and Mercado, it might be a good deal easier to understand. The difficulty that I have that apparently was shared by the district court is Zoo Stage's relationship with Mercado, such as to support an insurable interest on Zoo Stage's part, because it didn't appear to me to have any interest in Oro Rico or in the mining claims. Mercado owned all the claims. The funding came from Ramsey and his family and friends individually. So could you help me out on that, please? Well, Your Honor, unfortunately, these are not Wall Street entrepreneurs who go to the big law firm to figure out just how you should dot every I and cross every T. They are prospectors. They are Southern Arizona cowboy types. Mr. Ramsey formed the corporation. He didn't. And Mr. Bloss Mercado was a director of that corporation. That piece of evidence shows that Mr. Mercado was a director of Zoo Stage. There is evidence in the record of that, Your Honor. Is there a document? If you – there is. Our excerpt of record, Exhibit 1, which is the statement of facts to our motion for summary judgment, besides the evidence, I can't point to it. Well, was he a director at the beginning, or that is – I think he was a director at some point after the formation of Zoo Stage and Oro Rico. Well, yeah, but the insurable interest has to exist as of September 13, 1999. Well, I don't want to concede that he wasn't a director at that time, because if he can, then I'm not positive on that point. What I do know is that before these two corporations, there was a relationship between the two corporations, Oro Rico and Zoo Stage. There were monies that were sent to Blas Mercado in Mexico in cash, mainly because that was the only way they could do business in Mexico at the level they were doing business. And Arizona's statute on insurable interest doesn't suggest, nor does the common law suggest that you have to follow all the formality. There was testimony from several of the investors that Zoo Stage was the vehicle and the corporation that was formed that was going to essentially have the ownership interest in the profits from the mining operation in Mexico from Oro Rico. There was testimony and evidence that there was indeed a mining operation in Mexico and that Mr. Mercado was the overseer of that operation. There was money sent to him. There was no question that this enterprise was ongoing and that Mr. Mercado was critical to its success or its possible success. And Arizona's statute regarding insurable interest doesn't require, nor does the common law require any more than that. It doesn't require that you necessarily have a formal relationship. It just requires that this not be a wagering situation, that you're not just betting on the life of someone for profit, but rather that you expect you have some reasonable expectation that you will benefit from the continuation of the life of the person being insured. And there was clearly enough evidence to establish, it's one that Zoo Stage was engaged in raising money in Arizona to be used to fund the operation in Mexico, that money was sent and received, that mining equipment was purchased, and that Mr. Mercado was the principal overseer of that. The trial court in Phoenix, however, Counsel, let me interrupt you, this is Judge Ward. Is your argument then that if Zoo Stage is involved in any joint venture with another entity or other individuals, that creates in Zoo Stage an insurable interest in the people who are involved in the joint venture? Well, sure. It's our contention that if Mr. Mercado's activities in Mexico could benefit Zoo Stage and Zoo Stage had an interest in his activities in Mexico, that then Zoo Stage had an insurable interest. So a company would have an insurable interest in, for example, its key customers? It may have an insurable interest in its key customers. Say, for instance, if the customer had an account receivable or owed a debt, and to ensure that that debt was paid, the supplier took a policy out on the individual. That's essentially an Arizona case. The only Arizona case that discusses insurable interest in Arizona, Spyinger v. Marmis, is essentially what was at stake there. There was a partnership originally, but the partnership dissolved, and the insurable interest was based upon a contingent debt, not an existing debt, but one that might occur. And you, by advancing these arguments, you're assuming Zoo Stage has the burden to prove that insurable interest? No, I'm assuming that, indeed, I believe that the district court erred in placing the burden on Zoo Stage. It should have been on Zurich. Well, do you concede that in order to be valid, the insurance contract to be valid, there must be an insurable interest? Well, I concede that, but I think that if Zoo Stage is going to assert that the contract of insurance is void, it has the burden of establishing that there was no insurable interest. So that any contract is presumed valid is your argument, and Arizona has no policy that would not presume this contract valid? Well, no. Arizona has a policy that requires that an insurance contract, that there be an insurable interest. But that that is to say that the contract is void, either the public policy or some other reason, is a defense to the contract performance. It is not on the insured to assert that he doesn't have an insurable interest when at the time of contract formation, Zurich assumed that it did. And at that time, it had the obligation, if it wanted to, set down additional conditions or requirements regarding whether or not there was an insurable interest. It could have, but it did not. Mr. Salazzi, this is Judge Wardlaw again. This is what I'm puzzled by. The contract is taken out by Zoo Stage. Correct. But Zoo Stage didn't actually put out any funds as a corporate entity. It didn't give any money to Mercado. And I don't see the evidence, and perhaps you could point me to it, that Zoo Stage reasonably expected to receive a pecuniary gain from Mercado's activities while he was alive. From the evidence, it would seem that the profits would go directly to Rumsey and Rumsey's relatives and friends who sent the funds down to Mexico in the first place. So what evidence is it that Zoo Stage would get anything out of what Mercado was doing? Well, the deposition testimony of Mr. Rumsey, Robert Rumsey, Sr., the deposition testimony of his son, Mike Rumsey, who invested $30,000 through credit cards, Mr. Rumsey Sr. and his wife invested over $250,000. All right. What did they say about Zoo Stage? They said that the money was raised by Zoo Stage, not only from them but others, and all of the investors testified that Zoo Stage was the corporate entity that was to control the profits, to control the money that would come hopefully from the operation and be distributed. The fact that it wasn't done formally at the outset does not mean that that was not their intent and that was their testimony, and there was no contravening testimony. What Zurich puts up as a defense here is, well, gee whiz, you didn't put the money in the bank account called Zoo Stage. What you did is you just gave the money, you sent it down to BLAS in Mexico, either by cash or Western Union. Zoo Stage purchased some equipment, which we have records for and evidence of, but you didn't do it in a formal way. Well, I don't believe that the Arizona law or common law requires that kind of formality in order to demonstrate an insurable interest. There was enough evidence presented for this matter to go to the jury. The court construed all the evidence against the non-movement, the summary judgment here, and for the movement. I'm going to reserve what time I might have left for rebuttal, unless the court has any other questions. Certainly, that will be fine. Mr. Spelosy? May it please the court, my name is Leo Spelosy. I'm one of the lawyers for Zurich Life Insurance Company of America. There are four set of facts that I think the court touched upon. Some of them that are important to understanding whatever relationship there was between Zoo Stage and BLAS Mercado. The first one, and the court touched upon this a little bit, is what was Zoo Stage? Zoo Stage was a fledgling corporation at best. It had no assets. It had no employees. Its tax returns showed that at most it had $1,000 in cash or around there. It had 200 shares of common stock worth $200. The owners of the shares was the Mexican Mining Trust No. 4, according to the testimony of Robert J. Rumsey, who was the president of Zoo Stage. He was also the largest investor in this alleged Mexican mining operation. But he also conceded, Mr. Rumsey did, that he was not a beneficiary of that trust. Nor were any of the investors beneficiaries of the trust that held the Zoo Stage stock. Mr. Solis talked about how Zoo Stage was going to have a pecuniary benefit from these investments. It's just not borne out by the documents. That's the first thing regarding Zoo Stage. I think the court also touched upon, there really is no relationship between Zoo Stage and Oro Rico. Oro Rico was an operation in Mexico, where Robert Rumsey was involved in. He owned some stock in Oro Rico with Mr. Mercado. But Zoo Stage did not hold title of that stock. It was held by Mr. Rumsey. That is the sum total of the relationship between Oro Rico and Zoo Stage. Simply that the president of Zoo Stage, who had no financial interest in Zoo Stage, was a shareholder with Blas Mercado in this Oro Rico. Counsel, this is Judge Ware. Let's assume that this amounts to simply a joint venture kind of arrangement, then. Do you believe that Zurich is privileged to issue an insurance policy, even to a shaky company like Zoo Stage, to ensure its interest in others who are part of a joint venture? There's an affidavit from Lynn Patterson, who is the chief underwriter at Zurich Life Insurance Company, who indicated that had the true facts been told to Zurich in the application, this policy would not have been issued at all. But is Zurich capable of issuing a policy to a shaky company, one that has very little in the way of financing, but is a startup of some sort? It has the privilege to issue such a policy, correct? I do not think so, under the insurable interest statute that governs Arizona. I don't think it has that ability, because essentially it is, as Mr. Solis referred to, a wagering contract. The law prevents such contracts. I think a good example of that, Your Honor, was the Rubenstein case that is kind of comparable to the hypothetical you pose, where in that instance an individual found someone to buy his company for 240 payments of $1,000. There wasn't a reasonable expectation that that company was ever going to make a return of that $240,000. Therefore, the court found that to be a wagering contract. So I don't think that Zurich has the right to issue policies if it is in violation of the statute. Isn't the legality of a contract, though, an affirmative defense, which Zurich has the burden to carry? I don't think so, Your Honor, for a number of reasons. I think the first is the statute itself. It presupposes that insurable interest exists. If the contract is void from its inception, then I don't think that's affirmative defense. The second reason, I think the courts that have looked at this in this context under similar statutes, have almost all determined that it's not affirmative defense. But instead, the insured, or in this case the beneficiary, bears the burden of establishing the coverage. And as the court brought up, again, as noted in the briefs, it was Fonte, but Arizona law establishing burdens of coverage and insuring clauses and exclusion clauses would seem to indicate that, in this context, Arizona law does favor that the party trying to prove the existence of a contract demonstrated insurable interest. And the two stages counsel, in its brief, puts forth a number of cases which are essentially material misrepresentation cases, where it says the insurer has the burden to prove that the coverage doesn't exist. And in the material misrepresentation context, that's certainly true, because there you have, as part of the policy, you have affirmative defense in that instance, because the policy says that if it's a material misrepresentation, then we're not going to pay the claim. It's comparable to an exclusion clause. But here, when you go to the contract as a whole, and the issue of whether insurable interest exists, I believe the statute demonstrates that the insured or the beneficiary needs to establish the insurable interest. One other question along these lines. It seems to me that Zurich controls what information it requires in order to issue a policy. If it requires information about bank accounts, number of employees, that kind of detail, it can require that. Did it here? Your Honor, that is not part of the record, to be honest with you. The two stages did not depose any of Zurich's employees. There has been no allegation that there was something inappropriate in the underwriting of this policy at all. Instead, the only evidence we have is that, in this instance, ZooStage and Mr. Mercado represented to Zurich that Mr. Mercado was, I think, an employee of ZooStage and or associates, and that he was a supervisor for ZooStage. But wasn't that in a subsequent alteration? The actual application does look questionable. There's some interlineations. There is. I think that it's been signed by Blas Mercado. That's correct, Your Honor. Well, but it does give enough information and enough kind of the subsequent alteration of it, and enough, I guess, changes that I would wonder, wouldn't an insurance company be on notice that they ought to look into it? And first they list as employer for Mercado, ZooStage. Then later there's an addition and or associates, an initial by BMM. And I think in that instance, Your Honor, what happens is I think there was a change of ownership of the policy, if I remember correctly. And at that point what they do is they require that the person being insured, Mr. Mercado, sign the document. And that happened in this case. But are you saying that the insurance company has absolutely no responsibility to look into any of these representations at the outset? I'm not saying that, Your Honor. I'm saying there is nothing in the record that suggests or any testimony. There's been no definition of the underwriting people that the underwriting was done improperly, number one. Number two, as contained in the application, we have a right to rely on the truthfulness of the statements contained in the application, in this case which were made by Mr. Mercado, the insurer, and the owner of the policy and the beneficiary, ZooStage. If those statements turn out to be false, which we believe they were, we have a right to rely on those false statements. Well, the question really goes to whether or not you should be, the insurance company here, because, after all, it did issue the policy. It did get premiums. And so the question is whether or not, based on what it knew and that it benefited from this policy, it should be stopped from asserting that it's void now. Well, Your Honor, it didn't benefit. Even if the claim is denied, the premiums are returned. But the courts that have addressed this issue, the overwhelming number of courts that have addressed this issue, have determined that there can be no such estoppel or waiver by the insurer. We don't have that ability. Essentially, the overriding public interest in this case is to make sure that people aren't rewarded for wagering contracts, particularly in this case where ZooStage, who had no real affiliation with Mr. Mercado, would receive a $250,000 windfall. There are other ways that courts address this. One of the things, and it's alluded to in ZooStage's brief, is that some courts allow a family member of the estate to sue an insurance company when a policy is issued improperly and results in someone's death. Obviously, that's not the case here. No such claim has been brought, but that's one way to deal with it. There's no question that it would be better that these policies aren't issued at all. Let me ask you another question. If this policy had been issued in the name of RUMSE, as opposed to ZooStage, would you be arguing there was no insurable interest? I'm not sure that would be the case, Your Honor. I think it's a more difficult case on summary judgment if I still don't believe that an insurable interest exists, because I'm not sure Mr. RUMSE had any legal claim or any claim to the mines in Mexico. In fact, I think it's referred to in the briefs as PEMA I and PEMA II. Mr. RUMSE did not own those claims. That's not the requirement in the statute. The statute is lawful and substantial economic interest. And if, in fact, RUMSE and family were giving money to subsidize the mining operations, then wouldn't they meet that statutory criteria? Let me understand your question. You're asking me if they funded the Mexican mining operations, would they have a lawful and substantial economic interest? Right. Okay. I don't think so. I don't think they had an economic interest in those mines. I mean, maybe money was given to Mercado, but I don't know how that entitles them to the claims on PEMA I and PEMA II. Obviously, that's not the case here. I admit that that's a more difficult back scenario. This also presupposes, Your Honor, that there was these mining operations, which the only evidence we really have is the testimony of these folks. On summary judgment, isn't the testimony enough to meet the standard of more than a scintilla of evidence? Well, in some circumstances, Your Honor, I think that's true. With respect to the issue that I think you raised earlier, of whether the money was given to Mr. Mercado on behalf of ZooStage, I do not believe that to be the case. And that's really the only, I guess, fundamental disagreement that ZooStage and Zurich have, I guess, as far as the facts. We do not believe that the money given by the family members was on behalf of ZooStage, and that's why we pay so much attention to detail as to ZooStage's corporate formalities and amount of money in the bank account, the fact there's no employees. The mere statement by these investors, those on behalf of ZooStage, I don't think creates a genuine issue of material fact, because all the evidence, the documentary evidence, establishes otherwise. It establishes that it was made to individuals on their individual behalf, because all the corporate records and documents demonstrate that none of this money went through ZooStage and that it didn't have any money. So I would concede that, but for that fact, that maybe in the context of if it was Mr. Rumsey investing individually, that it would be a more difficult case out of the spots of motion, Your Honor. The estoppel argument probably only comes up after a circumstance like this, where the person whose life is put into balance is dead. But does that change the analysis at all? In other words, Zurich has accepted premiums, the insuring event has taken place, and now it raises a question about whether or not it should honor its policy. Frankly, it comes up in a number of contexts, but you're right. Most of the time it's going to come after someone is deceased. But the important public policy that the courts have recognized is that we can't reward folks who are wagering on other people's lives. We're going to return the premium. Believe me, Zurich is in no better position for having issued this policy. Obviously it had to deal with legal fees and all that stuff, and it's going to return the premium. So it has lost money on this policy. But in the wagering context, particularly where the investors admit that this is like, what they were doing is like Russian roulette and Las Vegas money, they should not be rewarded for the wagering on Mr. Mercado's life. Does that answer your question, Your Honor? Yes. And I think, Your Honors, I'm just about out of time. So for those reasons, we would respectfully request the trial court award of summary judgment be affirmed. All right. Thank you, Mr. Chelsea. Mr. Salisi? Thank you. I mean, there is absolutely no doubt that a group of people raised over $300,000 in an attempt to conduct mining operations for gold in Mexico, that Mr. Mercado was the person in Mexico who was overseeing that operation, that Zustage purchased mining equipment. There are receipts in the records of that. Not to the extent of $300,000, but there were receipts of $400,000. What's going on here, Your Honors, is that they didn't follow the formalities that one would like to see in a corporate structure. They didn't put the money in the bank account, name Zustage, take it out. They didn't keep the kinds of records that we would like to see. But there's no question this was not a wagering. Well, let me ask you a practical question. Suppose you win and Zustage gets $250,000 from Zurich this afternoon. Where's that $250,000 going? Going back to the investors. But they had no interest in Zustage. Oh, they all had the interest. What they did is trusted Robert Brent. Well, wait a minute, though. How does that happen? They're not shareholders. Well, there are some shareholders. Yeah, but the people who allegedly gave the money. They all testified, Your Honor, that they expected to get Mr. Rumsey. And if he doesn't pay back what he agreed to pay orally, we seem to forget that people can make oral agreements, that they can have handshakes. And this is a bunch of people who prospect. They're a bunch of cowboys in southern Arizona. And they do things on handshakes, unfortunately, for this situation. And they've been promised that they'll get their money back. And if Mr. Rumsey doesn't get their money back, I'm sure they'll sue him. But I don't understand how Zu gets the money to Rumsey. Well, he's a shareholder in Zu. Well, you know, I might be a shareholder in General Motors, too, but just because they get some money doesn't mean they're going to give it to me. Well, I understand that, Your Honor. I think so. The insurance company here is playing a very technical game. It had the opportunity at the outset to determine how and what kind of policy should be written and what information it wanted. It had the insured and it had the beneficiary, Mr. Rumsey, there when they were making the application. They have done nothing deceptive. They haven't lied to anybody. They just went about their business in Mexico trying to get this venture going. Gold mining is a risky proposition, and they put a lot of money into it, mortgaged their home, went into debt with credit cards, and they knew. Yeah, but they were doing it, according to the son's testimony, essentially for fun. I mean, that's a, you know. Well, we all do. You know, I mean, sometimes we invest in the stock market. They realized the risk. I think the point here, Your Honor, is that Arizona insurable interest statute and the case interprets it to say all you need is an expectation of gain. Let me interrupt for a second. Did Rumsey control ZooStage to the extent that had the insurance company written a check to ZooStage, which had actually deposited Rumsey and his wife, who I understand were the sole owners of the corporation, could pay it out? Yes. And what's the support for that? Well, because they had written checks out of ZooStage, a ZooStage account that purchased the equipment, $4,000 for a mining pole that went to Mexico. So they had the ability to negotiate on behalf of ZooStage. They were officers of ZooStage. And I believe that one, in terms of what the trial court did, is there was overwhelming facts that could go to a jury here. This wasn't a case where we had no facts that were in dispute. This was a case where we had pretty much all the facts were in dispute in the context of Zurich's contention that there were no records. But we did have records. They were not as Zurich would like them. We had testimony of investors and the relationship with ZooStage. We had testimony about the operation in Mexico. This should have gone to a jury to determine whether, one, there was an insurable interest. Counsel, you acknowledge that, as a matter of fact, it's undisputed that Mercado was not an employee, was not a shareholder, was not an officer of ZooStage. No, he was. He was an employee? He was an employee and shareholder. They had two corporations, one Oro Rico, and he was an employee of Oro Rico and the interest holder in Oro Rico, and he was the director in ZooStage. And so the policy said employees of ZooStage and or associates. Now, whether you want to say that Oro Rico was an associate corporation, that's how they saw themselves. One was that they needed a corporation in Mexico. When you say he was a director, he was a member of the board of directors disclosed to the Secretary of State's office? Yes, he was. And that is the relationship that you rely upon for purposes of the insurable interest? No, I'm relying on the actual relationship, which was that he was overseeing the operation in Mexico, actually, and that he was being sent money raised by Rumsey, the president of ZooStage, on behalf of the investors and ZooStage, and that he was actually the key man, which was the purpose of the policy in the first place. And, yes, he was the director of ZooStage, and, yes, he was an employee of Oro Rico, but in the real sense, he was doing the work. That's why he was so important, because without him, Mr. Rumsey and the investors had nothing. He was key. I think that I've used my time. All right, well, I don't think we have further questions. So, counsel, thank you both for your argument. The matter just argued will be submitted. Thank you, Your Honor.
judges: Rymer, Wardlaw, Ware